IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

MARY WILSON-FINN,              )
                              )
            Plaintiff,         )
                              )
      v.                       )      Case No.
                              )      05-3259-CV-S-REL-SSA
JO ANNE BARNHART, Commissioner )
of Social Security,            )
                              )
            Defendant.         )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Mary Wilson-Finn seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) determining plaintiff's residual functional capacity, (2) finding plaintiff not fully credible, and (3) not properly considering plaintiff's allegations of pain. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I. BACKGROUND

On July 27, 2001, and August 7, 2001, plaintiff applied for a period of disability and disability insurance benefits, applications which were denied on October 5, 2001. Plaintiff filed another application for benefits on March 5, 2002, alleging that she had been disabled since July 1, 2001. Plaintiff's disability stems from neck, back, and shoulder pain; numbness in her extremities; and anxiety. Plaintiff's application was denied May 17, 2002. On October 8, 2003, a hearing was held before Administrative Law Judge Mitchell Stevens. On February 27, 2004, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On June 16, 2004, the Appeals Council remanded the case to the ALJ. A supplemental hearing was held on October 13, 2004, before Administrative Law Judge William Kumpe, who requested that plaintiff undergo a mental consultative exam. On February 25, 2005, Judge Kumpe denied plaintiff's requests for benefits. On May 18, 2005, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might

Case 6:05-cv-03259-REL   Document 18   Filed 05/25/06   Page 3 of 71

accept as adequate to support a conclusion." <u>Richardson v.</u> <u>Perales</u>, 402 U.S. at 401; <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." <u>Id.</u>; <u>Clarke v. Bowen</u>, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. *BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS*

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. <u>Nevland v. Apfel</u>, 204 F.3d 853, 857 (8th Cir. 2000); <u>Brock v. Apfel</u>, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

4

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1. Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

5

## IV. THE RECORD

The record consists of the testimony of plaintiff and vocational expert Gary Weimholt, in addition to documentary evidence admitted at the hearing.

### A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record.**

The record shows that plaintiff earned the following income from 1978 through 2004:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1978 | $    0.00 | 1991 | $    0.00 |
| 1979 | 0.00 | 1992 | 2,113.12 |
| 1980 | 0.00 | 1993 | 5,699.49 |
| 1981 | 0.00 | 1994 | 1,901.02 |
| 1982 | 0.00 | 1995 | 0.00 |
| 1983 | 0.00 | 1996 | 4,150.37 |
| 1984 | 0.00 | 1997 | 0.00 |
| 1985 | 0.00 | 1998 | 2,912.84 |
| 1986 | 0.00 | 1999 | 1,282.69 |
| 1987 | 40.00 | 2000 | 2,438.06 |
| 1988 | 0.00 | 2001 | 1,037.16 |
| 1989 | 0.00 | 2002 | 0.00 |
| 1990 | 0.00 | 2003 | 0.00 |
|  |  | 2004 | 0.00 |

6

(Tr. at 81-84, 93-97, 100).

**Disability Report - Field Office.**

On July 27, 2001, Matthew Fuller met with plaintiff
face to face (Tr. at 101-104).  He observed that plaintiff
had difficulty sitting, standing, and walking (Tr. at 103).
He wrote, "The claimant was clean and dressed appropriately.
She sat very upright and moved slowly.  She stated that her
neck was particularly stiff and sore. During the interview,
she sat very still and her eyes were tearing up.  Her upper
body was shaking slightly.  She stood and walked slowly."
(Tr. at 103).

On March 6, 2002, another interviewer from Disability
Determinations met face to face with plaintiff (Tr. at 147-
150).  The interviewer observed that plaintiff had
difficulty with sitting, standing, and walking (Tr. at 149).
She wrote, "walked humped over, sat leaned forward, acted
like she was in a lot of pain, moved slowly, had a 'pained
look on her face'" (Tr. at 149).

**Claimant Questionnaire.**

In an undated Claimant Questionnaire received by
Disability Determinations on August 16, 2001, plaintiff
reported that she is taking aspirin, and she uses Ben-gay
and mineral ice (Tr. at 132-135).  She reported that she is

7

in pain constantly, she gets no relief from her pain, and everything she does causes pain. Her medication gives her an upset stomach and she thinks she may be getting an ulcer.

Plaintiff reported that she cannot get comfortable, she sleeps about two or three hours a night. She cannot put her hair up like she used to. She uses the microwave to cook. She has a hard time remembering. She does her own shopping but she needs help with the lifting. She does all her own household chores, but it takes her two or three times longer than it used to. Plaintiff drives to the grocery store once a week which is six miles round trip, and she drives to visit her mother once a week.

**Claimant Questionnaire Supplement.**

On August 12, 2001, plaintiff completed a Claimant Questionnaire Supplement (Tr. at 123). She reported that she walks around the house, inside and outside, two or three times daily, but she can only walk for five or ten minutes before needing to sit down (Tr. at 123). She goes grocery shopping once or twice a month. She reported that she can stand for five or ten minutes, she cannot lift anything heavier than a gallon of milk, she has no strength or grip in her hands, she has a hard time standing back up after bending, her knees hurt if she kneels or squats, she can

8

only climb a few stairs at a time because of her lower back, she loses her balance and her back goes out when she reaches forward, and she has no strength in her shoulders to reach overhead for more than five minutes.

**Claimant Questionnaire.**

On March 20, 2002, plaintiff completed a second claimant questionnaire (Tr. at 162-165). Plaintiff reported that she has headaches and tremors all the time with trying to sit or do anything (Tr. at 162). Plaintiff reported that moving at any time causes pain, sitting causes pain, standing causes pain and dizziness. Nothing relieves her pain. She reported no side effects from her medications.

She reported that it takes her three hours to do the dishes, she cannot vacuum, cannot feed her pets, cannot lift anything, cannot shower alone, cannot dress herself, cannot cook except in the microwave or oven. Plaintiff has a hard time concentrating on anything due to pain. She lifts her clothes out of the washer and dryer one piece at a time.

Plaintiff reported that she grabs onto walls, chairs, the bedpost, anything to keep from falling. "I need help in everything I do."

Plaintiff reported that she drives her mother to the store and she drives her mother to the doctor (Tr. at 164).

9

Plaintiff wrote that she tries to take care of her husband, who is disabled as well.

**B.  *SUMMARY OF MEDICAL RECORDS***

On January 4, 2001, plaintiff saw Michael Ball, D.O. (Tr. at 180).  She reported that she came out of a shed and fell the previous October, and her right elbow swells and her shoulder pops a lot.  Her main concern was her elbow. Dr. Ball x-rayed plaintiff's elbow, diagnosed epicondylitis (inflamation), and prescribed Celebrex (a non-steroidal anti-inflammatory).

July 1, 2001, is plaintiff's alleged onset of disability.

On August 16, 2001, plaintiff saw Ronald Buening, D.O., for a disability physical (Tr. at 181-182).  Dr. Buening's report reads in part as follows:

> CHIEF COMPLAINT:  The patient states that she is in pain all the time.  She states that her pain is located primarily in her midback, her neck and her low back area.  She states that she has "numbness in her joints".  She states that she was thrown from a horse in 1983 and was seen medically at that time and all x-rays were negative.  Four days later she picked up a box of something and "became numb for four days".  She has not been seen by any physician for her multiple myalgias and arthralgias since 1983.  The patient also complains of headaches. . . .  She has not seen anyone for her headaches either.  She states that she is able to "pop" her neck and that does seem to help alleviate the headaches as well as over-the-counter analgesia.

10

* * * * *

SOCIAL HISTORY:  The patient is currently separated.
She has two children in good health.  She is currently
unemployed.  Up until two or three months ago, she was
employed by McDonald's as a cook.  The patient is a
smoker and smokes about two packs of cigarettes per day
and she drinks caffeinated beverages at least two cups
of coffee per day.  She drinks a 12 pack of beer per
week on the average.  She states that she does do daily
exercises.

* * * * *

CARDIOVASCULAR:  She complains of an irregular heart
rate, poor circulation, rapid heart beat and swelling
of her ankles on occasion.

NEUROLOGICAL:  She admits to intermittent dizziness,
headaches, numbness in "her joints" and shaking.

* * * * *

MUSCLE/JOINT/BONE:  She admits to pain, numbness and
weakness in her arms, back, hands, hips, legs, neck and
shoulders.

* * * * *

OBJECTIVE:

GENERAL:  The patient is alert, oriented, times three,
in no acute distress, pleasant and cooperative
throughout the examination.

* * * * *

NECK:  . . .  The patient does have a notable resting
shakiness of the head and upper torso.  Whether or not
this is due to anxiety, I am unable to tell at the
present time.

* * * * *

11

> HEART: Regular in rate and rhythm without murmurs,
> clicks, gallops, or extra beats auscultated. . . .

Dr. Buening measured plaintiff's range of motion in her shoulders, elbows, wrists, hands, knees, hips, ankles, neck and back (Tr. at 182). All of plaintiff's measurements were normal, except her hip forward flexion was somewhat decreased, and her cervical spine lateral flexion was 30 (normal is 45) (Tr. at 182).

> Conclusion: Based on my interview and examination of
> this patient I feel like she does have some degree of
> arthralgias and myalgias and I do not believe that the
> diagnosis of fibromyalgia can be ruled out at the
> present time. She does have multiple trigger points
> palpated throughout the entire paravertebral
> musculature. However, I feel like the patient could
> stand for a typical six hour work day with the usual
> number of breaks without any significant difficulty. I
> feel like she could sit for a typical 8 hour work day
> with the usual number of breaks without any significant
> problems. I feel like she could lift 5 lb on a
> frequent basis. I feel like she could lift 10 lb on an
> occasional basis. Fine motor movements appear to post
> no significant problems. Hearing, speaking, and
> traveling appear to be no significant problems.

(Tr. at 182).

On August 28, 2001, plaintiff was examined by Michael Clarke, M.D., an orthopedic specialist, at the request of Social Services (Tr. at 183-184). Dr. Clarke's report reads in part as follows:

> <u>CHIEF COMPLAINT</u>: I have neck pain and spasms. I have
> headaches. I have low back pain and spasm. I think I
> have carpal tunnel syndrome and I have headaches.

12

SOCIAL HISTORY:  . . .  [H]er work through the years
has been doing house painting, farm work, she has done
factory work, working at the Brown Shoe company here in
the Ozarks. Her last work was working at McDonalds on
her feet a good deal.  She stopped doing that in May.

MEDICATIONS:  She takes several over the counter
medications, a[n] over the counter pain killer, Midol
for headaches, and PM for sleep.

On examination her vital signs are stable[,] she is
able to give a fair history[,] her weight is 121 pounds
and her height is 60 1/2 inches.  She says shortness
runs in her family.  Exam of the lumbar spine shows a
normal lumbar lordosis with a slightly decreased range
of motion but the neurological to the lowers is in
tact[,] there is no atrophy to muscles[,] neurovascular
status is in tact[,] the reflexes are equal to sensory
deficit[,] no objective sensory deficit likewise for
the upper extremity.  She may have a mild De quervaines
[inflamation of tendons in the thumb] because the
Finkelstein's test[1] is positive.  A little tender to
palpation all over the upper extremities.  The Phalon's
test[2] is negative and she doesn't have any atrophy.
And she does not describe any numbness in the median
nerve distributions, so I doubt carpal tunnel syndrome
is present.  I believe this exam today is consistent
with a fibromyalgia.  I've taken cervical spine films

---

[1]A test to determine the presence of De Quervain's
disease:  The patient bends the thumb into the palm and
grasps the thumb with the fingers. The patient then bends
the wrist away from the thumb. Pain over the tendons to the
thumb suggests the problem may be De Quervain's
tenosynovitis.

[2]A test for carpal tunnel syndrom:  The patient rests
the elbows on a flat surface, holds the forearms vertically,
and actively places the wrists in complete and forced
flexion for at least one minute. This maneuver moderately
increases the pressure in the carpal tunnel and has the
effect of pinching the median nerve between the proximal
edge of the transverse carpal ligament and the anterior
border of the distal end of the radius.

13

and they are within normal limits.  I've taken lumbar
spine films and they are within normal limits.

(Tr. at 183-184).

Dr. Clarke found that plaintiff was not medically
eligible for medical assistance and was not medically
eligible for general relief (Tr. at 185).

On September 17, 2001, Vincent Previti, M.D., completed
a Residual Functional Capacity Assessment (Tr. at 186-193).
He found that plaintiff can occasionally lift ten pounds,
frequently lift less than ten pounds, stand or walk for six
hours per day, sit for about six hours per day, and has an
unlimited ability to push or pull other than her lifting
restrictions.  Dr. Previti relied on the medical report of
Dr. Buening who stated that fibromyalgia could not be ruled
out, and plaintiff had multiple trigger points through her
paravertebral musculature.  He also relied on the normal x-
rays of plaintiff's lumbar spine and cervical spine.  Dr.
Previti found that plaintiff can occasionally climb,
balance, stoop, kneel, crouch, or crawl.  She had no
manipulative limitations such as reaching or fingering.  She
had no visual limitations, no communicative limitations, and
no environmental limitations.  Dr. Previti relied on
plaintiff's normal range of motion in all joints, and deep

14

tendon reflexes were 2+ symmetrically.

On January 31, 2002, plaintiff saw Michael Tracy, M.D., to establish care (Tr. at 201-203). She complained of pain on her left side since 1996, back pain, tremors, and blisters on her feet. Plaintiff was taking over the counter Tylenol. Plaintiff was living on a five-acre farm with her husband and son. She smoked 1 1/2 packs of cigarettes per day and had for the past 25 years. "She denies any alcohol use on a regular basis. Her last drink was a month ago. She denies any history of other drug use." Dr. Tracy noted that plaintiff was a pleasant female, resting comfortable, in no acute distress. He observed an intention tremor[3] of her head and her hands. She had normal gait, and deep tendon reflexes were brisk and symmetric. He found normal eyes, neck, lungs, and heart. "No joint swelling, erythema or tenderness. She does have marked paraspinous muscle tenderness in the left lumbar area. She is able to flex side-to-side and flex forward and extend reasonably well."

_____

[3]A tremor that occurs during activity and is often more marked as the limb nears the target. Intention tremor results from a lesion affecting the superior cerebellar peduncle, as a manifestation of toxicity of certain sedatives or anticonvulsant drugs or alcohol. It is also seen in patients with Wilson's disease.

Impression and plan:

1)  Left flank pain.  Will check urinalysis.  I told
    her that I doubt that she has kidney cancer based
    on the history and exam but this is her most
    pressing concern today.

2)  Back pain.  I wonder about a trial of muscle
    relaxants.  I prescribed Flexeril 10 mg p.o.
    [orally] t.i.d. [three times a day], p.r.n. [as
    needed], #30 with no refills.  She can call for
    refills.  I also gave a prescription for
    Amitriptyline 25 mg one tab p.o. [orally] , q.h.s.
    [at bedtime], #10 with no refills for chronic
    pain.

3)  Tremor.  I suspect that she has an intention
    tremor.  She may benefit from either low-dose
    Benzodiazepines[4] or a beta blocker[5].

4)  Dyshidrotic eczema.  I gave her a sample of
    Diprolene Cream to apply to this lesion [on her
    foot]."

On February 28, 2002, plaintiff returned to see Dr.

Tracy for a follow up (Tr. at 205-206).  Plaintiff reported

that her left flank pain had not significantly changed, was

somewhat worse with motion.  She complained of back pain in

the lumbar area and both paraspinous muscle regions.  The

---

[4]Any of a class of drugs prescribed for their
tranquilizing, antianxiety, sedative, and muscle-relaxing
effects. Benzodiazepines are also prescribed for epilepsy
and alcohol withdrawal.

[5]Reduces the symptoms connected with hypertension,
cardiac arrhythmias, angina pectoris, migraine headaches,
and other disorders related to the sympathetic nervous
system.

16

Flexeril made her groggy. "She continues to have a tremor which is noticeable at rest but worse with intention. . . . In general, she is a pleasant middle age white female, resting comfortably, in no acute distress. . . . She is breathing comfortably."

Plaintiff's heart was normal. She had mild left-sided upper tenderness to deep palpation. She had some left CVA[6] tenderness. "She also has paraspinous muscle tenderness in the left lumbar area. This is worse when twisting to the right."

Impression and plan:

1)    Left flank pain with hematuria [red blood cells in the urine]. This is occurring in the setting of a family history of renal cell carcinoma in her father. I am concerned with this constellation of symptoms that she may have nephrolithiasis [kidney stones]. I have also discussed other more worrisome causes of hematuria with her including renal cell carcinoma which could occur with flank pain or even the possibility of a bladder cell cancer given her history of smoking. I will have her see Dr. Tony Kaczmarek in consultation on Monday and discuss the case with him. We will likely proceed with radiological imaging after we have had a chance to discuss the case.

2)    Low back pain with paraspinous muscle spasm. She also has a history of tremor which I think makes Valium a reasonable choice as a muscle relaxant. I wrote a prescription for Valium 5 mg one tab

_____

[6]Costovertebral angle, the area in the mid back on each side of the spine.

p.o. [orally] b.i.d. [twice a day] p.r.n. [as needed], #60 with one refill. I told her to stop taking the Flexeril.

On March 4, 2002, plaintiff saw Anthony Kaczmarek, M.D., for left side flank pain she had been experiencing for the past three years (Tr. at 196-197). The medical records reflect that plaintiff had been smoking for 30 years, she occasionally drinks alcohol, and she occasionally used cocaine and marijuana but quit in 1981. The following were marked "normal" by Dr. Kaczmarek: neurologic/psychiatric, mood/affect, neck, cardiovascular, respiratory, lymphatic, gastrointestinal, thyroid, peripheral, auscultation, skin, liver, and spleen. He diagnosed pelvic pain but the "plan" is illegible.

On March 5, 2002, plaintiff filed the instant application for disability benefits.

On March 8, 2002, plaintiff's husband telephoned Dr. Tracy's office (Tr. at 210). The record reads as follows: "I spoke with Mary's husband, George Finn, on 03/08/02. He expressed concerns that his wife is an alcoholic and an extensive binge drinker. He told me that he thought that I should know this for the purposes of the chart. I told him that I appreciate his concern but that, without her authorization, I am not permitted to discuss anything

18

specific with regard to her condition.  I did suggest to Mr. Finn that he may try attending Al-Anon meetings as they may be helpful in helping him understand how alcoholism may affect family members and loved ones."

On April 1, 2002, plaintiff returned to see Dr. Tracy to discuss her neck pain (Tr. at 213).  She complained of neck pain, a headache, and an inability to turn her head to the side.  "She doesn't have any arm weakness or paresthesias [numbness and tingling]."  She continued to smoke one pack of cigarettes per day.  "She denies any recent alcohol use although she did say that she went out drinking with a friend when she and her husband separated for a few days in March."

Dr. Tracy noted that plaintiff was pleasant, resting, and in no obvious distress.  She had an intention tremor, worse of the head and neck.  There is no clear past

19

pointing[7].  No cogwheeling[8].  No bradykinesia[9].  No expression

difficulties.  Motor 5/5 throughout.  Normal gait.

Plaintiff has no paraspinous muscle tenderness to palpation.

Impression:

>    1)    Neck pain.  I gave samples of Vioxx 25 mg one p.o.
>          [orally] q.d. [one per day], #14.  She can return
>          for samples if these are helpful.
>
>    2)    Intention tremor.  Will try Atenolol [a beta
>          blocker] 25 mg 1/2 tab p.o. [orally] q.d. [once
>          per day], increase to one tab p.o., q.d. if she
>          tolerates the medication with no side effects.
>
>    3)    Thoracic and lumbar spine pain.  She is requesting
>          x-rays of her neck, thoracic spine and lumbar
>          spine.  These will be done and she will follow up
>          with me in four weeks, sooner if her symptoms
>          worsen in any way[10].

---

[7]A test of the integrity of the vestibular system:  the
subject, seated in a revolving chair, is rotated to the
right with eyes closed, then with the arm held horizontal,
the right index finger is brought in touch with the tip of
the examiner's finger; the arm is then raised vertically and
the subject is instructed to touch the examiner's finger on
bringing the arm once more to the horizontal; if the
vestibular apparatus is normal, the finger will be brought
down several inches to the right of the examiner's finger;
the reverse is true on rotation to the left.

[8]Cogwheeling is a ratchety pattern of resistance and
relaxation noted by an examiner when a limb or joint with an
underlying parkinsonian tremor is passively manipulated.

[9]A decrease in spontaneity and movement.

[10]There are no further records in the file from Dr.
Tracy, indicating that this was plaintiff's last visit with
Dr. Tracy.

20

On April 1, 2002, plaintiff had x-rays of her cervical spine, lumbar spine, and thoracic spine (Tr. at 211-212). She had moderately advanced degenerative changes present at C5-C6 and to a lesser degree at C6-C7, and she had loss of normal cervical curve/muscle spasm. Her lumbar spine x-rays were normal. Her thoracic spine x-rays were normal.

On May 15, 2002, a Disability Determinations physician completed a Physical Residual Functional Capacity Assessment (the doctor's signature is illegible) (Tr. at 215-222). The doctor found that plaintiff could occasionally lift ten pounds, frequently lift less than ten pounds, stand or walk for six hours per day, sit for six hours per day, and had an unlimited ability to push or pull other than for the lifting restrictions. Plaintiff could occasionally climb, balance, stoop, crouch, and crawl. She had no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations.

On July 5, 2002, plaintiff saw Linda Youngren, M.D., for back pain (Tr. at 224-225). Plaintiff described the pain as moderate and indicated that the pain interferes with her sleep, but not her "work, school, appetite, or household activities". Dr. Youngren diagnosed carpal tunnel symptoms, tobacco abuse, tremors, neck and back pain/muscle spasms.

21

She ordered an MRI of the cervical and lumbar spine.

On August 14, 2002, plaintiff returned to see Dr. Youngren for a follow up on her MRI (Tr. at 226-227). Dr. Youngren diagnosed soft tissue pain and swelling in the cervical and lumbar areas and recommended physical therapy.

On September 3, 2002, plaintiff returned to see Dr. Youngren for help in stopping smoking (Tr. at 228-229). Plaintiff was smoking 1 1/2 packs of cigarettes per day. Plaintiff stated that she had a history of anxiety attacks, her heart races, and she has depression, noting that she was separated from her husband, she had financial difficulties, and chronic pain. Dr. Youngren diagnosed dysthymia[11], insomnia, tobacco abuse, and allergy symptoms. She prescribed Wellbutrin[12], Trazodone[13], and an allergy medication.

On September 26, 2002, plaintiff returned to see Dr. Youngren for left flank pain (Tr. at 230-231). Plaintiff reported that the pain had been ongoing for years, and

---

[11]A disorder with similar but longer-lasting and milder symptoms than clinical depression.

[12]An anti-depressant also used to lessen the symptoms of tobacco withdrawal.

[13]An anti-depressant used to treat insomnia.

22

constant since 1999. Dr. Youngren noted no tremors on this visit. She diagnosed paraspinal muscle spasm and "numerous somatic complaints[14]" Dr. Youngren recommended a CT scan of the abdomen and an appointment with a physiatrist [a physician who specializes in physical medicine].

On October 28, 2002, plaintiff saw David Kent, M.D., after having been referred by Dr. Youngren (Tr. at 233-237). Dr. Kent's report reads in part as follows:

> HISTORY OF PRESENT ILLNESS: This is somewhat difficult to sort out complex as it is, and distant back in time going to 1983 even with a colliding horse riding injury to the head and two months later she said there was a right-sided weakness and paralysis after a good smack on the head during that horse ride hitting her head on a bridge. However, circumstances are vague and somewhat variable in her history during this intake and symptoms tended to be described in a circumferential and sometimes tangential fashion even to the point that she was suggesting symptoms, diagnoses or trying to associate symptom complexes with a diagnosis. She is very anxious, very uptight during the examination and made it somewhat difficult to be sure of details. At any rate, she complains of chronic diffuse soft tissue pain with headaches and shoulder and neck discomfort being the primary source with chronic aching in her low back as well. . . . The symptom complex has not changed grossly, but seems to have remained somewhat complex captivating her life and participating a functionally inert situation with any competitive work, income now being county dependent with Medicaid.

\* \* \* \* \*

---

[14]Unexplained physical symptoms.

PHYSICAL EXAMINATION: Demonstrates a female who is attentive, but somewhat rambling and tangential, frequently circumferential, difficult to keep on task and she tended to wander into identifying symptoms and wanting to be helpful and suggest diagnoses that she is fearful about. She was very anxious obviously, squirming in the chair frequently and manifests troubled and unperplexed facial expressions though was very cooperative during the examination.

\* \* \* \* \*

NEUROLOGIC EXAM: . . . Coordination was grossly functional with a little tremor noted in the upper extremities. . . .

MUSCULOSKELETAL EXAM: . . . Diffuse tenderness was noted over the shoulder and neck, paraspinals of the neck, interscapular stabilizers diffuse muscle tenderness though inconsistent in intensity, it was evident over the arms proximal to the elbows and forearms. There was also tenderness bilaterally in the lower extremities in the calf and thighs, etc. There was mild diffuse tenderness over the paraspinals of the low back, sacroilliac area and the buttocks bilaterally with questionable piriformis, but some burning qualities were evident over the lateral buttocks into the lateral thigh. . . .

PROBLEMS: We have a complex pain history that suggests some unknown etiology as generator for her chronic pain. The MRI scan of the cervical and lumbar spine were evident today and over the last couple of months demonstrated mild osteoarthritic changes C5-C6, C6-C7 and L4-5, L5-S1 with very mild deforming influence on the thecal sac. . . . The lady has a rather subjective examination with full range active muscle power throughout the limbs and torso, somewhat limited by pain obviously when she is sitting and putting her shoes on which makes me think of some general soft tissue myofascial pain syndrome such as fibromyalgia. . . .

At the present time, we are going to just focus on a modicum of pain relief by increasing her Neurontin to

24

300 mg q.i.d. [four times a day] if she is willing.
Also, will add Ultram one q. [every] 6 h[ours] to help
with pain relief and increase her trazodone 50 mg
scheduled two of those at h.s. [bedtime]. . . .

We talked about the diffuse somewhat difficult to pin
down nature of the etiology of her symptom complex,
thinking that the mild osteoarthritic changes on the
MRI scan do not necessarily describe all of her symptom
complex rather diffusely and so persistently and that
the accident going back to that mild head injury with
that episodic right-sided weakness syndrome back in
1983 does not explain in my mind these kinds of
symptoms either.

Her psychosocial history appears to be very complicated
and very compromising to her that she reported what was
not relating in any detail. Further drug past or other
influences other than her smoking history are
concerning at this time, but we are going to take a
conservative approach to try to enhance comfort and
hopefully mental well-being during this course of time
in spite of her impoverished personal, financial and
social situation.

. . . [W]aiting for Dr. Applegate's diagnostic input
on the tremors and the pain during the interim. I have
not scheduled any therapy since she is vague but
definite about a prior nonproductive course of physical
therapy in the past. We are hoping for some help from
the medications and will continue to encourage her
towards Disability, which apparently is being
undertaken by a social worker at Texas County Hospital
at Houston, Missouri.

(Tr. at 233-237).

On November 6, 2002, plaintiff saw David Kent, M.D.,

for a follow up (Tr. at 238-240). Dr. Kent's report reads

in part as follows:

She is looking calmer and more confident, better
animated and positive affect in her demeanor today.

25

She says she is feeling better and sleeping better and
having some benefit from pain relief with the
medications we have instituted. We asked her to add the
Ultram 50 mg q. [every] 6 h[ours] to the Zanaflex that
she did not fill so we do not know about the results of
that. She has been on Baclofen 20 mg t.i.d. [three
times a day] and is taking the Neurontin which she
thinks helps somewhat but she is only taking it twice
q.d. [once per day] and just restarted after an
absence. . . .

Comprehensive metabolic profile, CBC, HLAB-27, ANA are
all negative. Protein electrophoresis is negative and
I related that all to the patient today. She is
increasingly anxious as we went through the interview
and examination though she denies headaches new, no
dizziness new, no chest pain or shortness of breath new
but is just very concerned about the pain that she has
that is disruptive, and as we talked about it, you
could see the tension and distress arise in her
demeanor and her posture being rigid and stilted.

. . . The original lumbar MRI scan demonstrated mild
osteoarthritis in two levels of disks but no gross
entrapments or stenosis.

REVIEW OF SYSTEMS: . . . [T]he patient is into trying
to come up with a syndrome or diagnosis under her own
discretion it seems, wondering about past chemical
treatments and so forth. I related the occupational
exposures would probably better be addressed to Dr.
Applegate to pin down whether there is a peripheral
neuropathy or other myelopathy or whatnot due to any
occupational exposure or neural toxicity that might be
present. We will await the EMG nerve conduction study.

There is still mild paresthesias in the upper
extremities and she says some in the lower extremities
but does not define it or pin it down except that it
flares across the low back and into the upper buttocks
and down the lateral thighs with the same across the
shoulder/neck and the bilateral upper quadrants. . . .

PHYSICAL EXAMINATION: Demonstrated a gal who changed
from a very bright and informative female to a tense,

26

somewhat stilted and heavy breathing with pain
discomfort. When we were examining her standing, she
had good forward flexion though used her thighs to come
to full extension from bend, complaining about low back
pain. She demonstrated excellent toe standing, heel
standing. Her balance is really good on sit to stand
and turns and of course there was diffuse myofascial
tenderness and discomfort across the paraspinals of the
neck, the shoulder/neck and into the paraspinals and
intrascapular area, in the lumbar spine with gluteal
tenderness laterally to the lateral thighs. There was
no radiation into the legs though she talked about some
mild paresthesias into the legs, down into the calves.
Tenderness was minimal in the arms or forearms, minimal
in the thighs and calf muscles.

PLAN: . . . I talked about medication as our first
primary tool and then next week we will review what we
are doing with that plus talk about physical therapy,
myofascial stretch and manual traction to her head and
neck after we gain more information from Dr. Applegate
and experience with the medications. . . . I cannot
help but wonder, too, as her anxiety about the unknown
as I saw in the evolution of today's symptoms from mild
confident and at rest to stressed, groaning and
guarding position as part of the affect override here,
too. We may address that with some other medications
but she lives in Mountain Grove so the outpatient
chronic pain program is somewhat of an inconvenient
stretch for her to come this far.

(Tr. at 239-240).

On December 12, 2002, plaintiff returned to see Dr.

Kent for a follow up (Tr. at 242-245). Dr. Kent's records

read in part as follows:

The patient follows up today on almost a two-month
absence. She has been utilizing a number of other
medications which were prescribed by other doctors she
has been to [in] the past. She is on Labetalol for
tachycardia blood pressure syndrome that another
physician wrote for her. She has been also taking

27

Baclofen 20 mg t.i.d. [three times a day], Neurontin 300 mg q.i.d. [four times a day], Flexeril 10 mg q.i.d., Ultram 100 q. [every] 6 h[ours], and she has run out of that. Trazodone 50 mg h.s. [at bedtime] which she thinks has been helping with her sleep at night to some extent. Also she is taking Celebrex 200 mg b.i.d. [twice a day], she is uncertain of its helpfulness, Wellbutrin daily for smoking cessation and Flexeril 4 mg daily which she did not really fill that, so has not been actually taking it apparently. Tylenol she uses occasionally.

The patient has considerable anxiety, and of course titubation and tremor with weakness that she reports in her grasp and in using both upper extremities. Dr. Applegate has been evaluating with EMG nerve conduction studies and apparently CAT scans but the patient is uncertain as to what body part, either the head or spine, she actually scanned. There are no records available and the patient is uncertain of the results, and she is to follow up with Dr. Applegate here in a few days.

There has been no physical therapies implemented as we wanted to try to take a step-wise approach with the patient who is not nearly as suggesting or proposing a solution or diagnosis as she was the first one or two visits. She is more sedate today and more verbally appropriate and helpful, but still very nonspecific about complaints, generally stating that she is really about the same with the diffuse myofascial pain over the paraspinals of the cervical spine, shoulder, neck angle, and intrascapular stabilizers, the paraspinals, as well as the gluteal masses and the upper thighs. . . .

PHYSICAL EXAMINATION: Demonstrates a patient who is verbally more appropriate and more directed, though still somewhat vague and nonspecific about her responses, having a hard time remembering who wrote for what medications, and whether any medication is helping at all in her surmise.

MUSCULOSKELETAL EXAM: Demonstrated diffuse tenderness over the cervical paraspinals with significant pain and

28

discomfort in moving her head in any rotation. She is also very pain sensitive, hypersensitive diffusely over the paraspinals and shoulder-neck scapular stabilizers. Elevating and using the arms is without further problems, but she is unable to demonstrate any improvement of the myofascial discomfort over the paraspinals with limited flexion, extension aggravating her to a point of tears. Tenderness over the gluteal masses is diffuse as well as general aching, she says, is noted over the quads, the posterior hamstrings, and the gastrocsoleus.

Antigravity performance is pretty reliable, however, she does seem to have a mild wobbling quality to her which may be medication induced, as well as any neurologic that we are investigating.

SENSORY EXAM: Is unchanged. Does report some subjective paresthesias in the upper extremities but nonspecific. Intact position sense is otherwise unchanged. Is discriminative, but she is really vague as to any subjective experience. . . .

PLAN: The plan is to start decreasing as many of the medications as possible, such as decreasing the Neurontin to be discontinued over a two-week period of time. Also she is going to reduce the Baclofen and try to assess whether that is helpful for some of the myofascial discomfort. Flexeril she says definitely makes her sleepy and sedated during the day, so she is going to decline that as she feels comfortable. We are going [to] renew the prescription for Ultram 100 q. [every] 6 h[ours] though she says it makes her tongue feel dry. It is helpful to her generalized pain. . . .

She is going to maintain the Trazodone 50 mg h.s. [at bedtime] and try to get rid of the Celebrex and maintain the Wellbutrin. I have written orders for myofascial pain stretch massage, and manual traction of the cervical spine. The physical therapy specialist out in Mountain Grove [is] to assist with more manual and mechanical physical treatment for her. She understands the need to try to get rid of some of the medications since the copayments are really very draining on her very limited Welfare income at this

29

time, and we will see her back in about three weeks to
see how it is going.

(Tr. at 243-244).

On April 2, 2003[15], plaintiff returned to see Dr. Kent

for a follow up (Tr. at 247-248). Dr. Kent's records read

in part as follows:

> CHIEF COMPLAINT/HISTORY OF PRESENT ILLNESS: The
> patient comes to the office for follow up of chronic
> low back pain as well as neck, left hip, and knee pain.
> She has not been seen here since mid December, and she
> relates that since she saw us last, she has gone off
> all of her medication except she is using 500 mg
> acetaminophen [Tylenol] 2-3 of them about every three
> hours for pain. She reports that she has ongoing
> symptoms in these areas really without ever attaining
> any relief. However, she has decided that she cannot
> give up she has just got to keep going, so she returns
> today for any additional suggestions or follow up. She
> says that Dr. Youngren[16] is really at a loss for how to
> further help her with these pain complaints.
>
> PRIOR MEDICAL/FAMILY/SOCIAL HISTORY: . . . She does
> say that she is now divorced, and she is about to lose
> her general assistance and medical assistance benefits
> through the Division of Family Services. She is
> concerned that she will not have access to medical care
> after the end of this month. At that, she is trying to
> get things wrapped up with Dr. Applegate and get back
> in for further discussion of any of her findings.

---

[15]This is the last time plaintiff saw a medical
professional for treatment. All further medical visits were
at the request of Disability Determinations.

[16]The records indicate that plaintiff last saw Dr.
Youngren in September 2002 -- before her first visit with
Dr. Kent.

Case 6:05-cv-03259-REL   Document 18   Filed 05/25/06   Page 30 of 71

CURRENT MEDICATIONS:  Acetaminophen [Tylenol] 500 mg 2-3 tabs q [every] 3 h[ours] p.r.n. [as needed] [for] pain.

OBJECTIVE EXAM:
GENERAL APPEARANCE:  The patient is a moderately built young woman, actually appears a bit younger than her stated years.  She is casually dressed, neatly groomed, seems to walk pretty comfortably into the exam room and have a seat in the chair.  When we stand her up for exam, she really has a lot of marked pain behaviors.  These behaviors also tend to subside when we finish our exam and as we observe the patient to walk out of the clinical area. . . .

MUSCULOSKELETAL:  Musculoskeletal exam today reveals good mobility in and out of the exam chair.  She postures with very antalgic gait sparing weightbearing on her left lower extremity.  She complains of a lot of diffuse pain throughout the entire lumbar spine over into the piriformis area bilaterally.  She does not particularly have a lot of tenderness out into the gluteal muscles.  She is somewhat tender[], particularly along the left thoracolumbar paraspinal muscles and quite a lot bilaterally throughout her shoulder girdle musculature.  She is also diffusely tender with palpation of her arms and the left leg, not so much the right leg.  She complains of increased numbness and tingling in her left hand with hyperabduction of the left upper extremity, and this is pretty much diffuse whole hand paresthesia.  She has slight tenderness in the pectoral musculature on the left side, none in the supraclavicular area.  She is unable to trace out a specific pain pattern down that left lower extremity, and the pain today in her left leg does not go below the level of the knee.

MEDICAL RECORD REVIEW:  We received a copy of EMG study done by Dr. Applegate on November 7th of 2002, and it showed . . . [f]indings consistent with a possible mild L5 radiculopathy.  We reviewed all of our laboratory studies that we had performed in October of 2002, and essentially these were all within normal limits

31

including serum protein, electrophoresis, complete blood count adding nuclear antibody, B12, sed rate, metabolic panel, TSH, and HALB27. . . .

IMPRESSION:
1.    Predominant left myofascial shoulder/neck pain.
2.    Left flank low back pain.
3.    Lower extremity pain.
4.    Probable anxiety disorder.
5.    Tremor.
6.    Insomnia.

PLAN:  Tylenol 500 mg recommended only every six hours. We gave her samples of 2 mg of Gabitril.  She should try that daily at 8 p.m. for a couple of days, and then if she does well with it, we will increase her up to 4 mg at that time to see if we can help with her pain and insomnia complaints.  We will see her back here in the clinic in one month, and we will reply to previous inquiring from the Wright County Division of Family Services concerning her medical appropriateness for assistance services.

(Tr. at 247-248).

On November 13, 2003, plaintiff saw Shea Stillwell,

Psy.D., a licensed psychologist, at the request of

Disability Determinations (Tr. at 256-261).  Dr. Stillwell's

report reads in part as follows:

RECORDS REVIEWED:  Included with the claimant's authorization were medical records, which reviewed treatments for back pain, tremors, and concerns of potential cancer.  Ms. Wilson-Finn reported that she has suffered from chronic pain since being struck in the head by a nail 20 years ago.  Numerous physical evaluations were conducted, and the etiology was considered vague.  Her husband contacted physicians to inform them of alcohol dependence which was noted in the chart.  Ms. Wilson-Finn was considered to be experiencing some level of medical complications,

Case 6:05-cv-03259-REL   Document 18   Filed 05/25/06   Page 32 of 71

however these complications were not considered to be significant enough to impair her physical ability to sustain employment according to her medical records.

HISTORY OF CURRENT ILLNESS:  Ms. Wilson-Finn arrived to her interview without her medications and reported she recently ran out of Neurontin and Baclofen.  She also reported being prescribed Tramodol and Valium; Dr. Kent and Linda Ungrin prescribed these medications.  Her next appointment with Dr. Kent will be November 26. . . .

She also reports suffering from tremors and is uncertain why they have developed. . . .  She reported that she was informed her lower back pain was from a torn muscle and not cancer.  She also reported that she is unaware of any uterine pain, yet did acknowledge suffering from abdominal pain and reported her pain may actually be menstrual cramps.

PSYCHOSOCIAL HISTORY:  . . .  She attended high school through half of her tenth grade year.  She left because she frequently suffered high temperatures and the school nurse believed she was malingering. . . .  Her history of employment includes working on a farm for a few years and at Brown Shoe Factory from 1997 to 1999.  Working at Brown Shoe Factory was her longest period of employment.  She was fired for not attending work consistently.  She reported that she was suffering from pain at that time, was experiencing difficulty sleeping, and was unable to maintain consistent employment.  Ms. Wilson-Finn became tearful at this moment, discussing her pain. . . .  She reported having memory problems specific to her past and also reported some memory problems where she is unable to remember appointments. . . .  She acknowledged a history of drug experimentation, yet denied a history of addiction.  She reported having some problems with alcohol and may consume a 6 pack or 12 pack with a friend, yet may not consume alcohol for weeks at a time.  She has experienced blackouts and denied physical withdrawals while abstaining from alcohol.  She then stated she does suffer sleeplessness with abstinence and described periods of binge drinking.

33

. . . She has been prescribed psychotropic medications
but was unable to remember which medication.  In
addition, Ms. Wilson-Finn reported a history of suicide
attempt while intoxicated but was unable to be
specific.  She denied a history of intentional suicide
attempts and reported experiencing suicidal ideation
while intoxicated.  She then indicated that her
suicidal ideation is directly related to her experience
of pain, which she feels controls her life because it
is constant.

Ms. Wilson-Finn sleeps three to four hours per night
and attributed her sleeplessness to being awakened by
pain.  She also complained of suffering from
nightmares, where she is being physically abused.  She
also feels as though she worries about everything.  She
complained of chronic fatigue and feels her constant
pain makes her tired.  She denied experiencing
excessive energy.  She varied in the report of her
energy level and appeared uncertain whether her mood
remains stable.  She also described experiencing
nervous energy and indicated she has always experienced
problems with anxiety and paranoia. . . .

Ms. Wilson-Finn has married four times and has two sons
ages 24 and 25.  She had three marriages annulled
within the first 3 months and divorced one husband
after being married for one year.  She described a
strained relationship with her children because of her
drinking behaviors. She reported her children do not
interact with her if she is consuming alcohol.  She
described a significant change in her personality while
intoxicated and reported she becomes "nasty."  Ms.
Wilson-Finn feels that she alienates others by
consuming alcohol. . . .

ACTIVITIES OF DAILY LIVING:  The claimant reported she
is independent for all self-care, including bathing,
toileting, hygiene, dressing and eating.  She is able
to read, write, use the telephone, handle mail and
handle money.  During the day she watches television
and talks on the phone when she owns one. . . . This
individual stated she does the meal preparation,
grocery shopping, cleaning, laundry and homemaking when

34

able.  She does her own medication management and pays
the bills.

FORMAL MENTAL STATUS EXAMINATION:  Ms. Wilson-Finn
displayed many pain behaviors.  She held her head,
shifting frequently in her seat, closed her eyes
periodically, and also possessed notable tremors that
were present throughout her interview. . . .  She was
causally dressed, wearing a peach sweater, blue jeans
and exhibited marginal hygiene on the day of interview.
Her gait and station were within normal limits and she
did not utilize any assistive devices. . . .  Eye
contact was adequate and she was cooperative with the
examination.  This individual reported her mood to be
depressed and on the day of the interview displayed an
apathetic affect with a full range of affect present.
Speech and thought processes were clear and were
directed by the interview and testing process.  She did
not display behavior consistent with perceptual
abnormalities and did not report a history that would
suggest hallucinations or delusions.  She appears to
have limited insight and limited judgment skills.  She
appears to be a questionable historian of personal
information because of a tendency to endorse numerous
symptoms. . . .

This individual was alert and oriented times four.
Mental control was intact. . . .  Attention and
concentration functioning was adequate. . . .
Mathematical functioning was intact. . . .

Quality of thinking was marginal. . . .  Social
judgment skills were impaired. . . .  Intellectual
functioning appears to be in the Borderline range. . .
.  Memory functioning appeared to be intact. . . .

DSM-IV DIAGNOSTIC IMPRESSION:  . . .
AXIS I:    Clinical disorders and other conditions that
           may be a focus of clinical attention:
           303.90 Alcohol Dependence with physiological
           dependence.
           307.89 Pain Disorder with both psychological
           and a general medical condition, rule out
           somatization disorder [symptoms without
           medical explanation].

35

AXIS II:   Personality Disorder with paranoid and
           borderline traits.

* * * * *

AXIS V:   GAF = 60[17] (current).

Dr. Stillwell also completed a Medical Source Statement
of Ability to do Work-Related Activities (Mental) (Tr. at
262-263).  She found that plaintiff had no limitations in
her ability to understand and remember short, simple
instructions or in her ability to carry out short simple
instructions.  Plaintiff has slight[18] difficulty in
understanding and remembering detailed instructions and
making judgments on simple work-related decisions.  She had
moderate[19] difficulty in carrying out detailed instructions;
interacting appropriately with the public, supervisors, and
co-workers; responding appropriately to work pressures in a
usual work setting; and responding appropriately to changes

---

[17]A global assessment of functioning ("GAF") of 51 to
60 means moderate symptoms (e.g., depressed mood and mild
insomnia) or some difficulty in social, occupational, or
school functioning (e.g., occasional truancy, or theft
within the household), but generally functioning pretty
well, has some meaningful interpersonal relationships.

[18]"Slight" is defined on the form as some mild
limitations but the individual can generally function well.

[19]Moderate difficulty is defined on the form as
moderate limitation but the individual is still able to
function satisfactorily.

36

in a routine work setting.

Dr. Stillwell was asked if plaintiff's alcohol or substance abuse impairments contribute to her limitations. Dr. Stillwell wrote, "Yes. Her alcohol use causes relationship and work related problems. Such as poor attendance." When asked what changes to the findings the doctor would make if plaintiff was totally abstinent from alcohol, she wrote, "Her ability to adapt to a new environment would likely improve."

On November 17, 2003, plaintiff was seen by Charles Ash, M.D., an orthopedic specialist, at the request of Disability Determinations (Tr. at 249-250). Dr. Ash's report reads in part as follows:

> SOCIAL HISTORY: One package cigarettes daily. Last problem with heavy drinking two weeks ago. No prescription medicine.
>
> * * * * *
>
> GENERAL: This is a very anxious woman who stands erect and moves about satisfactorily without limp or list. She walks on toes and heels satisfactorily. . . . She squats 25 percent normally. She has moderate difficulty arising from the exam table, chair, dressing or undressing.
>
> * * * * *
>
> CERVICAL SPINE: There is normal motion. There is tenderness throughout. There is no muscle spasm or deformity. . . .

THORACIC AND LUMBAR SPINE:  There is tenderness
throughout.  There is guarded motion.  There is no
spasm or deformity.  [Range of motion normal except
flexion is 45, normal is 90; and extension is 10,
normal is 30]. . . .

UPPER EXTREMITIES:  There is normal range of motion.
There is tenderness throughout the left arm.  Pain is
produced in both wrists with extremes of motion. .
There is no weakness, deformity or atrophy.  Grip and
pinch are strong in both hands. . . .

LOWER EXTREMITIES:  Straight leg raising is 75 and not
consistent with back flexion. . . .  Pain is produced
in the low back with hip flexion and knee flexion and
any motion of the legs.  This is not anatomical
[relating to anatomy].  There is normal motion of the
hips, knees and ankles. . . .  There is no weakness,
deformity or atrophy. . . .

DIAGNOSIS:  Psychophysiological[20] musculoskeletal
reaction.

COMMENT:  Her findings are entirely subjective.

(Tr. at 249-250).

That same day, Dr. Ash completed a Medical Source

Statement of Ability to do Work-Related Activities

(Physical) (Tr. at 251-254).  Dr. Ash found that plaintiff

could occasionally lift 20 pounds, frequently lift ten

pounds, stand or walk for six hours per day, and push or

pull without limitation other than the lifting restriction.

He found that plaintiff has no sitting restriction.

---

[20]Psychophysics is the branch of physiology dealing
with the relationship between physiological processes and
thoughts, emotions, and behavior.

38

Plaintiff could occasionally climb, balance, kneel, crouch,
crawl, or stoop. She had no manipulative limitations, no
visual limitations, no communicative limitations, and no
environmental limitations. At the bottom of the form, Dr.
Ash wrote, "measured by objective findings only - severe
subjective symptoms" (Tr. at 254).

On November 19, 2004, plaintiff was seen by Sherman
Sklar, M.E., a licensed psychologist, at the request of
Disability Determinations (Tr. at 265-270). Portions of Mr.
Sklar's report read as follows:

> IDENTIFYING INFORMATION: Ms. Wilson . . . is casually
> groomed and dressed sporting long hair which was neatly
> combed. She exhibited tremors throughout her body
> throughout this examination as someone who has used
> alcohol extensively, but with control. She seemed to
> be straight forward and candid in responding to
> interview questions and is considered a reliable
> historian. Her effort on the intelligence test yielded
> valid results but her work on the MMPI produced an
> invalid exaggerated profile.
>
> CHIEF COMPLAINTS: Ms. Wilson, as she prefers to now be
> called, indicated that her chief complaints are
> alcoholism, a lack of trust in people and anxiety.
>
> HISTORY OF PRESENT ILLNESS: Ms. Wilson takes Trazodone
> to help her sleep at night and this is her only
> medication. . . .
>
> Ms. Wilson describes herself as someone [who] has used
> alcohol extensive[ly] but with control. Mostly her use
> is confined to a 6 or 12 pack on weekends, drinking
> with friends. She justified her use of alcohol in this

fashion as being due to pain and problems sleeping. She stated that alcohol diminished her pain and helped her sleep. She stopped drinking about one month ago. . . .

. . . She has difficulty with any kind of motivation. She lives a very limited lifestyle as a result. She has trouble sleeping and estimated that she sleeps only 3-4 hours a night although with Trazodone her sleep is a little bit more extensive. . .

Her day is described as her laying around the house, lying on the couch or sleeping. Her energy level is very weak and after about three hours she can't do much of anything and is not motivated to [do] anything but again she attributes this phenomenon to extensive pain. She also may crochet, fish or read which are her major life interests but she has curtailed them in the recent past because of her pain and boredom. . . .

PAST MEDICAL HISTORY: According to the claimant she has generalized pain etiology unknown except for the head injury suffered in a horse riding accident [20 years ago].

CONTRIBUTING FAMILY, DEVELOPMENTAL, SOCIAL AND ENVIRONMENTAL HISTORY:
. . . Alcohol: She quit drinking about a month ago and did acknowledge regular use though confined to weekends in order to alleviate her pain and help her sleep. She has never been treated for alcohol abuse or addiction and has had two driving arrests involved with alcohol.
Illicit Drugs: She acknowledged experimentation with some drugs. This was over 25 years ago. She has never had treatment for drug abuse nor has she ha[d] any legal problems for using drugs. . . .

DIRECT MENTAL STATUS EXAMINATION:
Appearance and Behavior: . . . Her facial expression was alert and her eye contact was good.
Ability to Relate: Her speech was spontaneous. She was coherent, relevant and logical.
Cooperation with the Examiner: Good.
Stream of Speech and Mental Activity: . . . There

Case 6:05-cv-03259-REL   Document 18   Filed 05/25/06   Page 40 of 71

were no signs of a thought disorder.
Mood:  Her affect reflected some nervousness and mild
depression. . . .

CURRENT LEVEL OF DAILY FUNCTIONING:
Activities of daily living:  Ms. Wilson lives in a
house by herself on a farm and she doesn't have any
bills but she does farm work in exchange for her rent
and utilities.  She utilizes food stamps to pay for her
nourishment.  She does cook a little, usually eating
two meals a day.  She does household chores and she
goes grocery shopping.  She drives.  She reads, goes to
church, pays bills and goes out to eat.  She never
rides a bus.  For enjoyment she likes fishing, reading
and crocheting which she does now to a limited degree.
. . .
Appearance and ability to care for personal needs:  No
problems in this area.
Concentration, persistence and pace:  The claimant
reported deficits in her ability to maintain her focus
over a sustained period of time but she did not
demonstrate any difficulty with focus or with attention
during this long examination.

TEST RESULTS:  Ms. Wilson was administered the MMPI-2
and she produced an invalid profile with a very high F
scale and very low K scale indicating an exaggeration
of her symptomatology and an overstatement of her
physical problems. . . .  Her profile cannot be
interpreted with any meaning. . . .

Ms. Wilson was administered the Wechsler Adult
Intelligence Scale-Third Edition (WAIS-III) and she
attained a Verbal IQ of 80 which is in the low average
range, Performance IQ of 76 which is in the borderline
range and a Full Scale IQ of 76 which is in the
borderline range.  These scores indicate generalized
limited learning ability across the board but no
significant learning deficits. . . .

DIAGNOSIS:

Axis I:  1. Alcohol abuse.  2. Depression due to
          suggestive physical pain.

41

Axis II:  Borderline intellectual functioning. . . .

Axis V:   GAF = 60 (Current) [moderate symptoms].

Mr. Sklar completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) (Tr. at 271-272).  He found that plaintiff has slight[21] impairment in understanding and remembering short, simple instructions; carrying out short, simple instructions; making judgements on simple work-related decisions; and interacting appropriately with supervisors.  He found that plaintiff has moderate[22] limitation in the ability to understand, remember, and carry out detailed instructions; interact appropriately with the public and co-workers; and respond appropriately to changes in a routine work setting.  In support of those findings, Mr. Sklar wrote, "Pt. [patient] experiences pain that dominates her thinking and lifestyle. She restricts her functioning as a result.  Lack of trust in people produces avoidant social behavior."

---

[21]Slight impairment is defined on the form to mean some mild limitations but the individual can generally function well.

[22]Moderate impairment is defined on the form to mean moderate limitation but the individual is still able to function satisfactorily.

Case 6:05-cv-03259-REL   Document 18   Filed 05/25/06   Page 42 of 71

*C.*   ***SUMMARY OF TESTIMONY***

During the October 8, 2003, hearing, plaintiff testified as follows:

At the time of this first administrative hearing, plaintiff was 43 years of age (Tr. at 299).  She was living alone (Tr. at 299).

Plaintiff last worked part time, four to five hours per day, at McDonald's until May 2001 (Tr. at 300).  When plaintiff took the job, she was told there was no lifting involved (Tr. at 300).  But she was required to carry boxes of hamburger patties from the freezer (Tr. at 300).  Plaintiff quit that job because it caused her pain (Tr. at 300-301).

Before McDonald's plaintiff worked from October 1999 until August 2000 pumping gas (Tr. at 301).  She worked four to five hours per day, three to four days per week (Tr. at 301).  Plaintiff had trouble with this job because she was on her feet a lot, and she could not wash the windshields because she was too short and because of her shoulders (Tr. at 301).

Plaintiff went to school through part of tenth grade and does not have a GED (Tr. at 302).  She has average reading and writing skills (Tr. at 302).  Plaintiff has

43

problems with her vision -- her doctor said she has a film over her eyes or the sun had bleached her eyes out, and if gets any worse she will need surgery (Tr. at 302). Her doctor changed her glasses prescription and told her to wear sunglasses and stay out of the sun (Tr. at 303).

Plaintiff's main reason for applying for disability benefits is her back pain (Tr. at 303). She has a sharp, burning pain that has been giving her problems since 1984 or 1985 but has gotten worse (Tr. at 303). At that time, plaintiff was thrown from a horse and a nail ripped her head open (Tr. at 304). A couple of months after that, she was paralyzed on her right side for four days (Tr. at 304). She went to a chiropractor for that (Tr. at 304).

Plaintiff has continued to have tremors and numbness (Tr. at 305). Her upper body shakes, but she is able to hold onto things (Tr. at 305). The tremors cause pain between her shoulders, in her neck, in her back, and the side of her head (Tr. at 306, 307). Her doctor told her to use ice, bed rest, and do no lifting (Tr. at 306).

Plaintiff has constant numbness in her hands and shoulder (Tr. at 306). Sometimes things "just go flying" out of her hand (Tr. at 306). Sometimes lifting a gallon of milk causes pain (Tr. at 308). She sometimes scoots her

44

laundry in a basket on the floor instead of lifting it (Tr. at 308).

Plaintiff gets a good night's rest once or twice a week with medication (Tr. at 307). The medication does not help all the time (Tr. at 307). Plaintiff dozes for two or three hours during the day because of not getting enough rest at night (Tr. at 307-308).

Plaintiff was asked about medication side effects, and she said "forgetfulness, hard to function." (Tr. at 308). Plaintiff was on a muscle relaxer that made her nauseous so her doctor took her off but she is not on any muscle relaxer now (Tr. at 308).

Plaintiff admitted that her medical treatment is "really pretty limited" (Tr. at 309). Plaintiff has trouble coming up with the money, even with the co-payments on her medications (Tr. at 310).

Plaintiff's most comfortable position is lying down with her legs elevated (Tr. at 310).

During the October 13, 2004, hearing, plaintiff testified as follows:

Plaintiff was still living alone at the time of this hearing (Tr. at 317). She testified that she got two DWI's around 1995 because she had broken an engagement and had

45

been in an abusive relationship (Tr. at 318).

Plaintiff testified that occasionally when she gets depressed, she cries (Tr. at 317). Plaintiff sometimes has nightmares, but she does not remember what they are about (Tr. at 319).

At the time of the hearing, plaintiff was taking 500 mg of over-the-counter non-aspirin pain reliever, but nothing else (Tr. at 318). She said she does not have the money to buy medications (Tr. at 318). She has tried to get a Medicaid card, but her application was pending at the time of the second administrative hearing (Tr. at 324).

Plaintiff testified that the last time she consumed alcohol was the weekend before the hearing when she had a couple of beers with a girlfriend (Tr. at 319).

Plaintiff described her past work, and testified that she worked as a farm worker from 1983 to 1999 milking cows and driving a tractor (Tr. at 322). She lifted less than ten pounds on that job (Tr. at 322).

Vocational expert Gary Weimholt testified at the request of the Administrative Law Judge.

The first hypothetical involved a person who could lift 20 pounds occasionally and ten pounds frequently; stand or walk for six hours per day; no sitting restrictions; no

46

pushing or pulling restrictions other than the lifting limit; and could occasionally climb, balance, kneel, crouch, crawl, and stoop (Tr. at 322-323). The vocational expert testified that such a person could perform plaintiff's past relevant work as a sewing machine operator, a fuel attendant, and a farm worker as she performed that job (Tr. at 323).

The next hypothetical added to the first one (Tr. at 323). This person would be limited to low stress, simple, repetitive, routine work with minimal interactions with others (Tr. at 323-324). The vocational expert testified that such a person could be a sewing machine operator or a farm worker as plaintiff performed that job (Tr. at 324).

## V. FINDINGS OF THE ALJ

On February 25, 2005, Administrative Law Judge William Kumpe issued his opinion (Tr. at 13-19). He found that plaintiff was insured through December 31, 2002 (Tr. at 13). At step one of the sequential analysis, the ALJ found that plaintiff has not engaged in substantial gainful employment since her alleged onset date (Tr. at 14). At step two, he found that plaintiff suffers from the following severe impairments: psychophysiological musculoskeletal reaction, alcohol dependence with physiological dependence, pain

47

disorder with both psychological and general medical condition, borderline intellectual functioning, and personality disorder with paranoid and borderline traits (Tr. at 14). At step three, he found that these impairments to not meet or equal a listed impairment (Tr. at 14).

The ALJ found that plaintiff retained the residual functional capacity to lift and carry ten pounds frequently and 20 pounds occasionally; sit, stand, or walk for six hours each in an eight-hour day; occasionally climb, balance, kneel, crouch, crawl, and stoop; and is limited to a low stress, simple, routine, repetitive work environment with minimal interaction with others (Tr. at 14). This residual functional capacity reflects an ability to perform a range of light work (Tr. at 14).

The ALJ found that plaintiff has mild limitations of activities of daily living; moderate limitations of social functioning, and moderate limitations of concentration, persistence, or pace (Tr. at 15). Plaintiff has a limited ability to perform detailed or complex work, but she can perform simple, repetitive and routine unskilled work (Tr. at 15). The ALJ found that plaintiff has had no episodes of decompensation (Tr. at 15).

48

At step four of the sequential analysis, the ALJ found that plaintiff could return to her past relevant work as a sewing machine operator or as a farm worker as she performed it (Tr. at 18). Therefore, plaintiff was found not disabled at the fourth step of the sequential analysis.

## VI. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

## A. CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment

49

unless it is not supported by substantial evidence on the record as a whole.  Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence.  Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ.  In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions.  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion.

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> In finding the residual functional capacity, the undersigned considered the claimant's subjective symptoms to the extent the undersigned found the

50

claimant credible. The claimant testified that she
cried when she was depressed. She testified she had
pain in her legs, back, neck, and shoulders. She
testified it hurt to sit or stand any amount of time.
The claimant stated in Social Security Administration
forms that she had pain in a variety of locations
including her neck and back. She stated she had
tremors. She essentially stated that any activity
resulted in pain. The undersigned finds that the
claimant is not fully credible in her allegations.

As noted above in the discussion of her residual
functional capacity, examiners observed that the
claimant behaved as though she were in pain and
appeared anxious. However, the examiners failed to
observe signs indicative of her allegations. They
often observed that she had a normal gait. They
usually did not note muscle weakness or atrophy. The
examiners often observed that she was alert, oriented
pleasant, and cooperative. The objective medical
evidence fails to support her allegations.

. . . [H]er treatment history overall does not support
her allegations. The objective medical evidence in the
record fails to show that the claimant sought treatment
in 2004. There is no objective medical evidence in the
record that she sought treatment from a mental health
professional. The claimant indicated she did not have
the financial ability to seek the treatment she needs,
but the evidence is insufficient that she sought
treatment from either a low-cost or free facility.

The claimant described in Social Security
Administration forms that she has a limited life-style.
However, she walked or drove when she went out of the
house. The claimant reported to Dr. Stillwell that she
was independent for all self-care. She reported she
was able to read, write, use the telephone, handle
mail, and handle money. She did meal preparation,
grocery shopping, cleaning, laundry and homemaking when
able. The claimant explained to Dr. Sklar that she did
farm work in exchange for rent and utilities. She
cooked a little. She did household chores and shopped
for groceries. She reported she drove and went to
church. She read and paid bills. These activities re

51

not fully consistent with the claimant's allegations about the severity of her symptoms and limitations.

(Tr. at 16-17).

## 1. PRIOR WORK RECORD

The ALJ did not discuss plaintiff's prior work record at length; however, the record before me establishes that plaintiff has reported earned income in only nine years of the 27 years included in her earnings record. Of those nine years, during one year she earned only $40. Her total lifetime earnings are only $21,574.75, which averages out to $2,397.19 in annual earnings during each of the years she reported income. In addition, plaintiff testified that she performed farm work from 1983 until 1999; however, during ten of those years she reported no earned income.

Plaintiff's prior work record suggests that her failure to seek employment now is based on something other than her physical condition. This factor supports the ALJ's credibility determination.

## 2. DAILY ACTIVITIES

Plaintiff reported in a claimant questionnaire that she cannot vacuum, feed her pets, lift anything, shower alone, dress herself, or cook.

However, in August 2001, she told Dr. Buening that she exercises every day.  In November 2003, she told Dr. Stillwell that she is independent for all self-care including bathing, toileting, hygiene, dressing and eating. She said she prepares her meals, shops for groceries, cleans, and does laundry.

In November 2004, plaintiff told Sherman Sklar that she only occasionally crochets, fishes, or reads in part due to boredom.  She also reported that she currently does farm work in exchange for her rent and utilities.  She was still performing household chores, shopping for groceries, driving, going to church, and going out to eat.  She reported having no problems in caring for her personal needs.

Plaintiff's allegations in her disability documents and during the hearing are entirely inconsistent with her reported daily activities in medical reports.  This factor supports the ALJ's credibility determination.

### 3. *DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS*

In August 2001, the month after her alleged onset date, plaintiff told Dr. Buening that she could pop her neck and that alleviated her headaches.  She also said that over-the-counter pain medicine helped her headaches as well.  In

November 2003, she told Dr. Stillwell that her abdominal pain may just be menstrual cramps.

Plaintiff reported in a claimant questionnaire that she has no strength in her hands or shoulders, and that she experiences dizziness. Yet she told Dr. Kent that she had no dizziness and her grip strength has been 5/5.

Plaintiff reported that she has to grab onto walls, doors, the bedpost, anything to keep from falling. However, her doctors have observed that her gait and station are normal, and she has never utilized any assistive devices.

In August 2001, Dr. Buening found that plaintiff's range of motion in her shoulders, elbows, wrists, hands, knees, ankles, neck, and back were all normal. In November 2003, Dr. Ash found that plaintiff's range of motion in her cervical spine, thoracic and lumbar spine, upper extremities and lower extremities were all essentially normal.

Dr. Clarke found that plaintiff's x-rays of her cervical spine and lumbar spine were normal. In April 2002, x-rays of plaintiff's lumbar spine and thoracic spine were normal. Her MRI scan showed only mild osteoarthritic changes in her neck. An EMG study showed only possible mild L5 radiculopathy. All of her laboratory studies have been normal.

54

This factor supports the ALJ's credibility determination.

## 4. *PRECIPITATING AND AGGRAVATING FACTORS*

There are no precipitating or aggravating factors discussed in the record.

## 5. *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION*

During much of the time following plaintiff's alleged onset of disability, she was taking no prescription medication, was participating in no physical therapy or other non-medicine pain relief, and was taking only over-the-counter pain relievers.

In August 2001, plaintiff told Dr. Buening that popping her neck and taking over-the-counter pain medication alleviated her headaches. In January 2002, plaintiff told Dr. Tracy she was only taking over-the-counter Tylenol. In April 2003, plaintiff told Dr. Kent she was taking only over-the-counter Tylenol. In November 2003, plaintiff told Dr. Ash that she was taking no prescription medication. During the administrative hearing, plaintiff testified that she was taking nothing but over-the-counter pain medication.

The record also establishes that when plaintiff did take the medication that was prescribed, it appeared to work for her. In November 2002, plaintiff told Dr. Kent that she

55

was feeling better, sleeping better, and had been having pain relief with the medications he had prescribed. In December 2002, she told Dr. Kent that the Trazodone was helping her sleep and Ultram was helping her generalized pain. In November 2004, plaintiff was taking only Trazodone, and she told Sherman Sklar that the Trazodone was helping her sleep at night.

The record also establishes that on many occasions, plaintiff disregarded medical advice and apparently tried to diagnose herself. In August 2002, Dr. Youngren recommended physical therapy, yet there are no records indicating that plaintiff participated in physical therapy. In October 2002, Dr. Kent noted that plaintiff was suggesting symptoms and diagnoses, and trying to associate symptom complexes with a diagnosis. In November 2002, plaintiff failed to take the Zanaflex prescribed by Dr. Kent. She had also stopped taking the Neurontin, but then started back up again. Dr. Kent noted that plaintiff was trying to come up with a syndrome or diagnosis on her own. In December 2002, Dr. Kent noted that plaintiff was using medicine that had been prescribed in the past by other doctors instead of taking the medicine he had prescribed the month before. He also noted that plaintiff had not taken the Flexeril he had

56

prescribed for her.  Dr. Kent wrote orders for plaintiff to get myofascial pain stretch massage and manual traction of the cervical spine; however, there are no records indicating she followed through.

This factor supports the ALJ's credibility determination.

### 6.  FUNCTIONAL RESTRICTIONS

The record establishes that no doctor has ever placed any functional restrictions on plaintiff.  To the contrary, every doctor who has seen plaintiff has essentially agreed on her limitations.

Dr. Buening found that plaintiff could stand for six hours, sit for eight hours, lift five pounds frequently and ten pounds occasionally.  He found no manipulative limitations, and no limitations in hearing, speaking, or traveling.

Dr. Previti found that plaintiff could stand or walk for six hours per day, could lift less than ten pounds frequently and ten pounds occasionally, had no limitations on pushing or pulling; could occasionally climb, balance, stoop, kneel, crouch, or crawl; and had no manipulative, visual, communicative, or environmental restrictions.

57

A Disability Determinations physician found that plaintiff could stand, walk, or sit for six hours per day; could frequently lift less than ten pounds and occasionally lift ten pounds; had an unlimited ability to push or pull; could occasionally climb, balance, stoop, crouch, and crawl; and had no manipulative, visual, communicative, or environmental limitations.

Dr. Ash found that plaintiff could sit without limitation, stand or walk for six hours, frequently lift ten pounds and occasionally lift 20 pounds, and push or pull without limitation. He found that plaintiff could occasionally climb, balance, kneel, crouch, crawl, or stoop, and that she had no manipulative, visual, communicative, or environmental limitations.

This is a sharp contrast to plaintiff's testimony. She testified that her doctor told her to do no lifting; however, no doctor ever restricted plaintiff's lifting. Plaintiff testified that she has problems with her vision, a doctor told her that she had a film over her eyes and if they get worse she will need surgery. There is no record of plaintiff complaining of her vision to any doctor, and no doctor has ever found any limitations to her vision. Plaintiff testified that things "just go flying out of her

Case 6:05-cv-03259-REL   Document 18   Filed 05/25/06   Page 58 of 71

hand"; however, Dr. Ash found that the grip and pinch in both of plaintiff's hands were strong. Further, she never complained to any doctor about an inability to hold onto things.

This factor supports the ALJ's credibility determination.

**B. *CREDIBILITY CONCLUSION***

In addition to the factors discussed above, I find many instances in the record supporting the ALJ's finding that plaintiff is not entirely credible. There have been very long stretches of time when plaintiff sought no medical treatment at all. For example, her alleged onset date is July 1, 2001, yet on that date it had been seven months since she had been to see a doctor. After her alleged onset date, the only doctors she saw for the next seven months were doctors she had been sent to by Disability Determinations. Therefore, plaintiff went 14 months with no treatment by any doctor. In December 2002, Dr. Kent recommended myofascial pain stretch massage, manual traction of the cervical spine, and physical therapy, and told plaintiff to come back in three weeks. However, she waited four months to return to see Dr. Kent, and there is no evidence that she took part in any of his pain-relief

recommendations.

Plaintiff complained of an inability to pay for her medications and doctor bills. Yet, the record establishes that plaintiff had a continuous source of money for her cigarettes and alcohol. In August 2001, plaintiff was smoking two packs of cigarettes per day. She said she was drinking a 12-pack of beer per week on average. In January 2002, she was smoking 1 1/2 packs of cigarettes per day and had for the past 25 years. In March 2002, plaintiff told Dr. Kaczmarek that she occasionally drinks alcohol. In April 2002, plaintiff was still smoking a pack of cigarettes per day. In July 2002, Dr. Youngren diagnosed tobacco abuse. In September 2002, plaintiff was still smoking 1 1/2 packs of cigarettes per day. In November 2003, plaintiff told Dr. Stillwell that she consumes six to 12 beers when she gets together with a friend, and she described periods of binge drinking. In November 2003, plaintiff told Dr. Ash that she continued to smoke a pack of cigarettes per day and had done heavy drinking just two weeks earlier. In November 2004, plaintiff told Sherman Sklar that she confines her drinking to a six pack or twelve pack on weekends. During the administrative hearing, plaintiff testified that she consumed alcohol with a girl friend the previous weekend.

Plaintiff's choosing to spend money on cigarettes and alcohol contradicts her claim that she did not seek medical treatment because of a lack of funds.

The record also establishes that plaintiff did not appear to take advantage of the medical assistance that was offered her. In April 2002, Dr. Tracy gave plaintiff samples of Vioxx and said she could return for more samples. There is nothing in his records showing that plaintiff returned to get the additional free samples. In April 2003, plaintiff was given free samples of Gabitril and was told to come back in a month; however, plaintiff did not return to see Dr. Kent to get further samples of Gabitril.

In October 2002, Dr. Kent noted in his medical record that plaintiff was on Medicaid. In April 2003, plaintiff told Dr. Kent that she may lose her medical benefits at the end of the month. Yet during that period when the record establishes that plaintiff was on Medicaid, she saw Dr. Kent only twice, saw no other doctor during that time; and although Dr. Kent told her in December 2002 to come back in three weeks, plaintiff waited nearly four months to return to see him. Plaintiff's last visit to a doctor for treatment was April 2003. Although Disability Determinations sent plaintiff to doctors in connection with

61

her application for disability benefits over the next 19 months, there is no evidence that plaintiff ever sought treatment during that time. In April 2003, plaintiff told Dr. Kent that Dr. Youngren had no other ideas for plaintiff's treatment; however, the record establishes that plaintiff had not returned to see Dr. Youngren after September 2002 when she first recommended that plaintiff go to see Dr. Kent.

Finally, the record establishes that the medical evidence contradicts plaintiff's allegations, and that she regularly exaggerated her symptoms while being examined. Dr. Tracy found that plaintiff was able to flex side to side and flex forward and extend "reasonably well." In September 2002, Dr. Youngren noted numerous "somatic complaints." In October 2002, Dr. Kent noted that plaintiff had full range active muscle power through the limbs and torso and only mild osteoarthritic changes. In October 2002, Dr. Kent wrote that plaintiff was vague and somewhat variable in her history, had a "rather subjective examination", and it was difficult to pin down the cause of her symptoms. He noted that she had only mild osteoarthritic changes on her MRI scan, and her horse riding accident 20 years earlier would not explain her symptoms. In November 2002, Dr. Kent noted

62

that plaintiff changed from a "very bright and informative female to a tense, somewhat stilted and heavy breathing with pain discomfort" during his exam. In April 2003, Dr. Kent noted that plaintiff walked comfortably into the exam room, but when he had her stand up for the exam, she developed "a lot of marked pain behaviors" which subsided when the exam was finished and plaintiff was observed walking normally out of the clinical area. In November 2003, Dr. Stillwell noted that plaintiff varied in the report of her energy level and appeared uncertain whether her mood remained stable. She referred to plaintiff as a questionable historian of personal information because of a tendency to endorse numerous symptoms. In November 2003, Dr. Ash noted that plaintiff had normal motion in her cervical spine, essentially normal range of motion in her lumbar and thoracic spine, normal range of motion in her upper extremities, no weakness, no deformity, no atrophy, strong grip and pinch in both hands, normal range of motion in her hips, knees, and ankles, no weakness, deformity or atrophy in her lower extremities. He also noted that plaintiff's straight leg raising was not consistent with her back flexion. He diagnosed musculoskeletal reaction based on emotional causes, and he commented that her findings were

63

entirely subjective.  In November 2004, Sherman Sklar noted that plaintiff's MMPI produced an invalid exaggerated profile indicating an exaggeration of her symptomatology and an overstatement of her physical problems.  He commented that plaintiff said she had trouble focusing over a sustained period, but she did not demonstrate any difficulty with focus or attention during his "long exam."

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's decision to find plaintiff not credible.  Therefore, plaintiff's motion for summary judgment on this basis will be denied.

## VII. PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY

Plaintiff argues that the ALJ disregarded the opinion of Sherman Sklar[23] without explaining why, and improperly relied on the opinion of Dr. Stillwell.

The record establishes that the findings of everyone who examined plaintiff's mental health are consistent.  Below is a comparison of the findings of Dr. Stillwell and Sherman Sklar:

---

[23]Both plaintiff and the ALJ referred to Sherman Sklar as "Dr. Sklar."  Sherman Sklar is a licensed psychologist; however, there is nothing in the record indicating he holds a doctorate degree of any kind.

64

|  | Dr. Stillwell | Mr. Sklar |
|---|---|---|
| Understand & remember short, simple instructions | No limitation | Slight limitation |
| Carry out short, simple instructions | No limitation | Slight limitation |
| Understanding & remembering detailed instructions | Slight limitation | Moderate limitation |
| Make judgments on simple work-related decisions | Slight limitation | Slight limitation |
| Carrying out detailed instructions | Moderate limitation | Moderate limitation |
| Interacting appropriately w/public, co-workers | Moderate limitation | Moderate limitation |
| Interacting appropriately w/supervisors | Moderate limitation | Slight limitation |
| Responding appropriately to work pressures | Moderate limitation | Moderate limitation |

This chart establishes that the only relevant differences between the findings of Dr. Stillwell and Mr. Sklar are plaintiff's ability to understand, remember, and carry out short, simple instructions. Although there is a difference as well in their findings regarding plaintiff's

65

ability to understand and remember detailed instructions, the ALJ found that plaintiff is limited to simple, repetitive, routine unskilled work and has a limited ability to perform detailed or complex work.

The form completed by both Dr. Stillwell and Mr. Sklar defines slight limitation as follows: "There is some mild limitation in this area, but the individual can generally function well." Therefore, I fail to see how a slight limitation would prevent a claimant from performing the function described. No one found that plaintiff had any more than a slight limitation in her ability to understand, remember, and carry out short, simple instructions. Therefore, the ALJ was entitled to find that plaintiff is capable of understanding, remembering, and carrying out short, simple instructions.

I find that the substantial evidence in the record as a whole supports the ALJ's residual functional capacity assessment. Therefore, plaintiff's motion for summary judgment on this basis will be denied.

### VIII. COMPLAINTS OF PAIN

Finally, plaintiff argues that the ALJ improperly discounted plaintiff's complaints of pain. I have already addressed plaintiff's credibility in an earlier section.

66

Plaintiff points out numerous instances when doctors found that plaintiff experienced pain, including in the records of Dr. Clarke, Dr. Ball, Dr. Tracy, Dr. Kaczmarek, Dr. Youngren, Dr. Kent, Dr. Stillwell, Dr. Ash, and Mr. Sklar.

Plaintiff states that Dr. Clarke diagnosed possible fibromyalgia. However, Dr. Clarke took x-rays of plaintiff's back and neck which were normal, and he found that plaintiff was not medically eligible for medical assistance or general relief. Therefore, regardless of whether he believed plaintiff suffered pain or had fibromyalgia, it is clear he did not believe that it impaired plaintiff's ability to work.

Dr. Ball saw plaintiff once prior to her alleged onset date. He diagnosed inflamation of plaintiff's elbow and prescribed an anti-inflammatory. He did not recommend that plaintiff return, and she indeed did not return to see him. Therefore, there is no evidence that the pain in plaintiff's elbow was expected to last any length of time, and Dr. Ball failed to place any physical restrictions on plaintiff, so it does not appear that her pain was bad enough to interfere with her ability to work. In fact, plaintiff did work at McDonald's for several months after her elbow pain was reported to Dr. Ball.

Although Dr. Tracy found muscle tenderness in plaintiff's left lumbar area, he found she was able to flex side to side and flex forward and extend reasonably well. He prescribed only a muscle relaxer, and expressed his concern that plaintiff had kidney stones.

Dr. Kaczmarek diagnosed pelvic pain based on plaintiff's complaint of pelvic pain. She later stated that her pelvic pain was probably menstrual cramps.

Plaintiff told Dr. Youngren that her back pain interfered with her sleep, but not her work or household activities. Dr. Youngren recommended physical therapy for plaintiff's back pain. The only medication Dr. Youngren ever prescribed was to help plaintiff stop smoking, sleep better, and for her allergies. Dr. Youngren never prescribed any pain medication for plaintiff.

Dr. Kent found that plaintiff had a "subjective examination" with full range of active muscle power throughout the limbs and torso. He also noted that plaintiff was trying to come up with a syndrome or diagnosis on her own, and that plaintiff did not take the medication that Dr. Kent recommended. He noted that she changed from a very bright and informative person to a tense, somewhat stilted and heavy breather with pain discomfort when she was

68

being examined.  He questioned whether her "anxiety about the unknown" was causing her physical symptoms.  On her next to last visit, when plaintiff's pain moved her to tears, Dr. Kent recommended physical therapy, myofascial pain stretch massage, and manual traction of the cervical spine.  There is no evidence that plaintiff took part in any of these recommendations, and plaintiff failed to return in three weeks as recommended, waiting almost four months to return to see Dr. Kent.  During that last visit, plaintiff said she continued to experience pain, but had gone off all medication and was taking only over-the-counter Tylenol. Dr. Kent noticed during this visit that plaintiff was able to move around just fine until the exam started.  At that time, she exhibited marked pain behaviors.  When the exam was completed, the marked pain behaviors ceased.

Dr. Stillwell found that plaintiff suffers from pain disorder "with both psychological and a general medical condition, rule out somatization disorder".

Dr. Ash found that plaintiff had normal range of motion in her cervical spine, her upper extremities, and her lower extremities.  She had essentially normal range of motion in her lumbar and thoracic spine.  She had no weakness, deformity, or atrophy in any upper or lower extremities.  He

found that she had psychophysiological musculoskeletal reaction, and commented that the findings were "entirely subjective".

Finally, Sherman Sklar noted that plaintiff exaggerated her symptomatology and overstated her physical problems.

The medical records do not support plaintiff's allegations of disabling pain.

In addition, plaintiff stated that she worked on a farm in exchange for rent and utilities, she lived alone and was able to care for herself, do all her own housework and shopping, and she takes her mother to the doctor. Her daily activities are inconsistent with the type of disabling pain she alleges.

I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's pain is not disabling. Therefore, plaintiff's motion for summary judgment on this basis will be denied.

## IX. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is
affirmed.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
May 25, 2006

Case 6:05-cv-03259-REL   Document 18   Filed 05/25/06   Page 71 of 71